UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CORNHUSKER CASUALTY CO., a Nebraska corporation,<br><br>Plaintiff,<br><br>v.<br><br>SQI, INC., a Washington corporation; WEST SEATTLE PROPERTIES, LLC, a Washington limited liability company; LEDCOR INDUSTRIES (USA) INC., a Washington corporation; ADELAIDE TOWNHOMES, A CONDOMINIUM OWNERS ASSOCIATION, a Washington corporation; ADELAIDE CONDOMINIUM OWNERS ASSOCIATION, a Washington corporation; and ADELAIDE MASTER CONDOMINIUM OWNERS ASSOCIATION, a Washington corporation,<br><br>Defendants. | CASE NO. C08-0456-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 34), Defendant SQI, Inc.'s Response (Dkt. No. 37), Defendant Ledcor Industries (USA) Inc.'s Response (Dkt. No. 42), Defendant West Seattle Property, LLC's Response (Dkt. No. 36), and Plaintiff's Reply (Dkt. No. 45); Ledcor's Motion to Compel Discovery (Dkt. No. 47), Plaintiff's Response (Dkt. No. 49), SQI's Response (Dkt. No. 51), Ledcor's Reply (Dkt. No. 52), and Plaintiff's Surreply (Dkt. No. 53). The Court has carefully considered these documents, their supporting declarations and exhibits, and the balance of relevant materials in the case file, and has determined that oral argument is not necessary. For the reasons explained below, the Court hereby GRANTS Plaintiff's motion and DENIES Defendant Ledcor's motion, and rules as follows.

ORDER – 1

# I. FACTUAL BACKGROUND

This is a declaratory judgment action arising from an insurance coverage dispute in an underlying lawsuit. Plaintiff Cornhusker Casualty Co. moves for a summary judgment declaration that it has no obligation to defend or indemnify any defendants in this action with respect to a pending consolidated construction defect lawsuit (the "underlying litigation"). The underlying litigation stems from the construction of the Adelaide Project in West Seattle, which consists of two developments known as the Adelaide Condominiums and the Adelaide Townhomes. The Adelaide Condominiums are seventy-one residential units above ground-floor commercial space in a single high-rise building located at 5001 California Avenue SW. (Mot. 5 (Dkt. No. 34).) The Adelaide Townhomes are nine residential units in two buildings located at 4315 and 4321 SW Hudson Street. (*Id.*)

In 2002, developer Defendant West Seattle Properties, Inc. ("WSP") hired Defendant Ledcor Industries (USA) Inc. ("Ledcor") as the general contractor for construction of the Condominiums and Townhomes. Thereafter, Ledcor hired Defendant SQI, Inc. ("SQI") to install the roofing on all three buildings that make up the Adelaide Project. (*Id.*) The Ledcor-SQI subcontract required SQI to make Ledcor and WSP additional insureds under SQI's insurance. (Subcontract 8 (Dkt. No. 35-2 at 29).)

SQI obtained its liability insurance from Plaintiff Cornhusker under a Commercial General Liability ("CGL") policy for three consecutive annual periods, from May 1, 2003 to May 1, 2006. (Mot. 2 (Dkt. No. 34).) Under the policy's basic grant of coverage, Cornhusker agreed to "pay those sums the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which [its] insurance applies." (CGL Coverage Form 1 (Dkt. No. 43-2 at 7).) Cornhusker's policies, however, contained some exclusions that are the subject of the instant dispute.

In the first and second coverage years, the policies contain a "Limited Residential Construction" exclusion, which provides:

> This insurance does not apply to "bodily injury" or "property damage" resulting from or arising out of "residential construction" . . . .

ORDER – 2

> For the purposes of this endorsement, "residential construction" means work or operations of any nature or extent on, with respect to, or in support of structures intended for human habitation, including but not limited to "condominiums". "Residential construction" does not include, however, "houses intended for single-family occupancy" or "apartments."
>
> "Condominiums" means structures whereby separate parts of the structure may be owned individually by separate owners and the underlying property is owned in common by all the separate owners together.
>
> "Houses intended for single-family occupancy" means a single-family dwelling where the underlying property is owned by the owner of the dwelling or multiple units of single-family dwellings, owned individually and joined by common walls such that no units are located over another, where the underlying property is not owned by all the separate owners together.
>
> "Apartments" means structures containing more than one single-family dwelling where the owner of the structure owns each dwelling together with the underlying property.

(Limited Exclusion (Dkt. No. 35-2 at 14).) In the third coverage year, the policy contained a slightly more expansive "Certain Residential Construction" exclusion:

> This insurance does not apply to "bodily injury" or "property damage" resulting from or arising out of the original construction, in whole or in part, of condominiums or townhouses by any insured, regardless of whether such construction is or was undertaken partially or fully completed by any insured or on any such insured's behalf. We shall have no duty to defend or indemnify any insured with respect to such injury or damage.

(Certain Exclusion (Dkt. No. 35-2 at 20).)

The Cornhusker policies also extended excess coverage to third parties where SQI was contractually required to insure them. The additional insured endorsement provides:

> 1. The insurance afforded hereby is excess over any other valid and collectible insurance, whether such other insurance is primary, excess, contingent or otherwise. Where the Additional Insured has valid and collectible insurance in excess of a self-insured retention, this insurance is excess over the combined limits of such insurance and the self-insured retention. Where the Additional Insured does not have valid and collectible insurance applicable to a claim that would be covered by the policy, the Additional Insured shall have a self-insured retention of the first million dollars of any covered loss and the insurance afforded hereby shall be excess over such self-insured retention;
>
> 2. The insurance afforded hereby to any Additional Insured is limited to imputed liability specifically resulting from the conduct of the Named Insured for which any additional Insured is held liable.

(Additional Insured (Dkt. No. 35-2 at 6).)

ORDER – 3

In 2007, the Adelaide Townhomes Owners Association and the Adelaide Condominium Owners Association filed separate lawsuits, which were later consolidated, in the King County Superior Court against WSP, the original owner of the Adelaide Project. (Underlying Compls. (Dkt. No. 35-3 at 33-38, 74–82).) The complaints allege numerous construction defects, including roof-related defects, at the Adelaide Project. (*See id.*) Thereafter, WSP filed third-party claims against Ledcor which, in turn, filed fourth-party claims against SQI and others who worked on the project. SQI then tendered Lecor's claims to Cornhusker, which agreed to defend SQI against Ledcor's claims under a reservation of rights. (Mot. 8 (Dkt. No. 34).)

Ledcor and WSP also tendered the claims against them to Cornhusker as additional insureds under the SQI policies. In response, Cornhusker determined that Ledcor and WSP qualified as additional insureds, but stated that any coverage available to them as additional insureds was excess over their other insurance, or if there was none, the coverage would be excess over a $1 million self-insured retention. (Ledcor Tender 1–2 (Dkt. No. 35-3 at 51–52); WSP Tender 1–2 (Dkt. No. 35-3 at 65–66).)

In March 2008, Cornhusker filed this declaratory judgment action and now seeks summary judgment, requesting a declaration that it has no duty to defend, indemnify, or pay benefits to any of the defendants in this case. Ledcor and SQI have each filed response briefs, and WSP filed a response joining in Ledcor's opposition.[1] In addition, Ledcor has filed a motion to compel discovery.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable

---

[1] The arguments advanced by Ledcor are therefore incorporated by reference into WSP's Response.

ORDER – 4

inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

### B. Insurance Policy Interpretation

The interpretation of an insurance policy is a question of law. *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). Insurance policies are contracts, which are construed as a whole with the terms interpreted in the way that would be understood by an average person purchasing insurance. *Id.* If the language is clear and unambiguous, the court must enforce it as written and may not create ambiguity where none exists. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., Inc.*, 951 P.2d 250, 256 (Wash. 1998). Determining whether insurance coverage exists is a two-step process. *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003 (Wash. 1992). The insured must first demonstrate that "the loss falls within the scope of the policy's insured losses." *Id.* at 1003–04. To avoid coverage, the insurer must then show that the loss is excluded by specific policy language. *Id.* at 1004. Exclusions from coverage are strictly construed against the insurer because they are contrary to the fundamental protective purpose of insurance. *Stuart v. Am. States Ins. Co.*, 953 P.2d 462, 464 (Wash. 1998).

Under Washington law, the duty to defend is broader than the duty to indemnify. *Hayden v. Mutual of Enumclaw Ins. Co.*, 1 P.3d 1167, 1171 (Wash. 2000). "The duty to indemnify hinges on the insured's actual liability to the claimant and actual coverage under the policy." *Id.* at 1171. The duty to

ORDER – 5

defend, however, exists where the complaint against the insured, construed liberally, alleges facts which could impose liability upon the insured within the policy's coverage. *Truck Ins. Exch. v. VanPort Homes*, 58 P.3d 276, 281–82 (Wash. 2002). "Only if the alleged claim is clearly not covered by the policy is the insurer relieved of its duty to defend." *Id.* at 282. Thus, Cornhusker may obtain a summary judgment declaration that it has no duty to defend or indemnify if the allegations in the underlying complaint, liberally construed, are "clearly not covered by the policy."

### C.     The Limited Residential Construction Exclusion

Cornhusker argues that it has no duty to defend or indemnify any defendants because the Adelaide Townhomes and Adelaide Condominiums are excluded from coverage by the Limited Residential Construction exclusion (the "Exclusion"). (Mot. 9 (Dkt. No. 34).) The Exclusion precludes coverage for damage resulting from work related to "structures intended for human habitation, including but not limited to, 'condominiums.'" (Exclusion (Dkt. No. 35-2 at 14).) There is little doubt that both the Adelaide Condominiums and the Adelaide Townhomes are "structures intended for human habitation," and therefore come within the purview of the Exclusion. There are, however, two exceptions to the Exclusion that preserve coverage under the policy for "houses intended for single-family occupancy" or "apartments." (*See id.*)

SQI and Ledcor contend that the Adelaide Townhomes are covered by the policy because they fit the definition for "houses intended for single-family occupancy." (SQI Resp. 7–8 (Dkt. No. 37); Ledcor Resp. 10–12 (Dkt. No. 42).) Under this exception to the Exclusion, a structure containing "multiple units of single-family dwellings" qualifies for coverage where (1) the units are owned individually, (2) joined by common walls, (3) not located on top of one another, and (4) the underlying property is *not* owned by all the separate owners together. (*See* Exclusion (Dkt. No. 35-2 at 14).) The Adelaide Townhomes undisputedly contain "multiple units of single-family dwellings" that satisfy the first three criteria. Thus, the disputed issue is whether the Townhomes satisfy the fourth criterion. If the underlying property is "*not* owned by all the separate owners together," then the Townhomes would satisfy the definition of

ORDER – 6

"houses intended for single-family occupancy" and would be covered by Cornhusker's policy as an exception to the Exclusion. (*See id.*) On the other hand, if the underlying property "is owned in common by all the separate owners together," then the Townhomes would be explicitly excluded from coverage as a "condominium" under the policy. (*See id.* (defining a "condominium" as a structure "whereby separate parts of the structure may be owned individually by separate owners and the underlying property is owned in common by all the separate owners together")).

The description of the property rights held by Adelaide Townhome owners demonstrates that the underlying real property is owned in common, and therefore, the Townhomes cannot fit the exception for "houses intended for single-family occupancy." The Declaration and Covenants, Conditions, Restrictions and Reservations for the Adelaide Townhomes (the "Townhome Declaration") defines each "Unit" as the "portion of the Condominium designated for *separate* ownership, the boundaries of which are described pursuant to Article 4." (Townhome Decl. §1835 (Dkt. No. 39-2 at 7) (emphasis added).) Article 4, in turn, defines the "Unit Boundaries" of each individually-owned unit:

> Units shall consist of an envelope of space, the perimeter boundaries of which on the surface of the land as located and depicted on the Survey Map and Plans and which boundaries extend below and above the ground elevation of each Unit as shown on the Survey Map and Plans. A Unit shall include *all structures, improvements, and fixtures* now or hereafter located within said space[.]

(*Id.* at § 41 (emphasis added).) Thus, although the "envelope of space" of each "Unit" extends above and below the ground, the separately-owned Unit itself only consists of the structures, improvements and fixtures within this boundary—not the *real property*.[2] These separately-owned units are distinguished from the "Common Elements," which are defined as "all portions of the Condominium *other than the Units*." (*Id.* at § 188 (emphasis added).) Article 6, titled the "Description of the Common Elements," provides that "the Common Elements consist of all portions of the Condominiums except Units and include . . . [t]he *Real Property* described in Exhibit A, and improvements thereto, which are *not part of*

---

[2] The Townhome Declaration uses the terms "property" and "real property" interchangeably. (*See id.* at § 1829.) Thus, the term "underlying property" refers to the underlying *real property*.

ORDER – 7

*a Unit.*" (*Id.* at Art. 6, § 61 (emphasis added).) Consequently, the "common elements" include the real property beneath each unit because such underlying property is not part of the "Unit" itself. By the express terms of the Townhome Declaration, the underlying real property is owned in common by all the separate Unit owners. Therefore, the clear terms of the Exclusion preclude coverage for claims involving property damage to the Adelaide Townhomes.

SQI contends that its subjective intent regarding the character of the Adelaide structures is relevant because the word "intended" is used in the Exclusion. (SQI Resp. 9 (Dkt. No. 37).) SQI asserts that the Adelaide structures cannot be considered "condominiums" excluded from coverage because it "intended to work on apartments, commercial space and townhomes." (*Id.* at 9–11.) The Court finds little merit in this argument. The word "intended" appears twice in the Exclusion. First, it is used to define "residential construction" as "structures intended for human habitation." (Exclusion (Dkt. No. 35-2 at 14).) SQI cannot credibly dispute that the Adelaide *structures* were intended for human habitation. These structures, which contain residential units, therefore fall within the exclusionary language. Second, "intended" is used to describe the exception for "houses intended for single-family occupancy." (*Id.*) This exception expressly applies only if four criteria discussed above, none of which turn on subjective intent, are satisfied. (*See id.*) Regardless of SQI's intent, the Adelaide structures cannot fall within this exception because the underlying real property is *not* owned by the individual unit owners.[3]

SQI and Ledcor next contend that the Adelaide Condominiums are not subject to the Exclusion because the structure contains two commercial spaces underneath the seventy-one residential units. (SQI

---

[3] Alternatively, SQI suggests that the Adelaide Condominiums and Townhomes could be considered "apartments" excepted from the Exclusion because WSP owned the entire complex *at the time of construction*. (SQI Resp. 11–12 (Dkt .No. 37); *see* Exclusion (Dkt. No. 35-2 at 14) (defining "apartments" as "structures containing more than one single-family dwelling where the owner of the structure owns each dwelling together with the underlying property").) SQI's interpretation of the definition of "apartments" as applying to the nature of ownership *during construction* is nonsensical because it would render the Exclusion and its exceptions entirely meaningless. Because the individual units in the Adelaide complex are ultimately owned by each unit owner, they cannot be considered "apartments" under the Exclusion's definition.

ORDER – 8

Resp. 12–13 (Dkt. No. 37); Ledcor Resp. 10–12 (Dkt. No. 42).) SQI and Ledcor assert that the two spaces located on the ground floor preclude application of the Exclusion because those commercial spaces are not intended for human habitation. (*See id.*) This argument misses the mark. The Exclusion, by its very terms, applies to "*structures* intended for human habitation." (Exclusion (Dkt. No. 35-2 at 14) (emphasis added).) Therefore, the relevant inquiry is whether the structure as a whole is considered "residential," i.e., "intended for human habitation." (*See id.*) Because the Adelaide Condominiums building undisputedly contains *seventy-one* residential units, the structure is intended for human habitation and precluded from coverage by the Exclusion.

In sum, neither the Adelaide Townhomes nor the Adelaide Condominiums are covered by Cornhusker's policies under any reasonable interpretation of the Exclusion and its exceptions. Even construing the Exclusion against Cornhusker, it cannot reasonably be interpreted to provide coverage because the Adelaide structures were "intended for human habitation" and do not fit the exceptions for "houses intended for single-family occupancy" or "apartments." Because the Exclusion is clear and unambiguous, the Court must enforce it as written. *See B&L Trucking*, 951 P.2d at 256. The underlying allegations of defective construction in the Adelaide Project are "clearly not covered by the policy." Accordingly, Plaintiff's request for a declaration that it has no duty to defend or indemnify any defendant in this action with respect to the underlying litigation is GRANTED.

**D.    Bad Faith Allegations**

Ledcor asserts that even if the Exclusion precludes coverage, as the Court has determined, Cornhusker's motion should still be denied because Ledcor's tender of the underlying claims was denied in bad faith. (Ledcor Resp. 12–15 (Dkt. No. 42).) Ledcor contends that Cornhusker should be estopped from denying coverage because it acted in bad faith by refusing to defend Ledcor while agreeing to defend SQI. (*Id.* at 15.) In addition, Ledcor requests an order compelling the production of Cornhusker's claims files to discover evidence of bath faith claims handling. (Compel Mot. 2 (Dkt. No. 47).)

Ledcor's argument fails to recognize that it is not a primary insured like SQI, but rather an

ORDER – 9

additional insured to which Cornhusker's policies provide *excess coverage*. Cornhusker's policies state that the insurance afforded to Ledcor as an additional insured is "*excess* over any other valid and collectible insurance." (Additional Insured (Dkt. No. 35-2 at 6) (emphasis added).) And, if there is no other insurance, "the Additional Insured shall have a self-insured retention of the first million dollars of any covered loss and the insurance afforded hereby shall be *excess* over such self-insured retention." (*Id.* (emphasis added).)

Ledcor has offered no evidence to indicate that Cornhusker has violated its duties as an excess insurer. The Washington Supreme Court has described an excess insurer's duty to defend:

> An excess insurer's obligation to defend is generally defined by the excess policy.... [A]n excess insurer's duty to defend may also arise when: (1) the claim is covered under the language of the excess policy; (2) the excess policy does not expressly eliminate any defense obligation; and (3) the coverage and obligations of the underlying insurers have been validly exhausted. If an excess insurer were required to defend before exhaustion of an underlying carrier's duty, then the primary carrier would profit from its wrongful failure to defend.

*Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 134–35 (Wash. 2000) (internal citations and quotations omitted). Thus, Cornhusker's duties to Ledcor as an excess insurer are defined by the policy and depend on whether the obligations of the underlying insurers, if any, have been exhausted.

Cornhusker's policies provide that it has "the right, but *not the duty*" to defend the insured where the insurance is excess and the insured has other insurance. (CGL Policy 14 (Dkt. No. 43-2 at 20) (emphasis added).) If Ledcor has no other insurer to defend it, Cornhusker "*may* undertake to do so." (*Id.* (emphasis added).) Because Ledcor's coverage is excess, Cornhusker has no absolute duty to defend under the policy. Instead, Cornhusker's duty is limited to providing excess coverage over the combined limits of other insurance and the self-insured retention, or if there is no other insurance, then Cornhusker's coverage is excess over a self-insured retention of $1 million. (*See* Additional Insured (Dkt. No. 35-2 at 6).) Ledcor has presented no evidence showing that it lacks a primary insurer, or that its other insurance or self-insured retention has been exhausted in the underlying litigation. Nor has Ledcor shown that Cornhusker has violated any duty owed to it as an additional insured under the policies.

ORDER – 10

Ledcor has therefore failed to allege facts sufficient to support a bad faith claim against Cornhusker. Because Ledcor's underlying claim is not covered by Cornhusker's policies and it has presented no evidence to otherwise support its allegations of bad faith, its motion to compel discovery regarding its bad faith allegations is DENIED.

## III.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 34). The Court FINDS and DECLARES that Cornhusker has no obligation to defend, indemnify or pay any benefits to any defendant in this action with respect to the underlying litigation. Defendant Ledcor's Motion to Compel Discovery (Dkt. No. 47) is therefore DENIED.

SO ORDERED this 23rd day of December, 2008.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 11